# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

HELEN L. D.,[1]

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Case No. 17-cv-869-JPG-CJP

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in April 2013, alleging that she became disabled as of March 27, 2012. After holding an evidentiary hearing, ALJ Kevin R. Martin denied the application on August 10, 2016. (Tr. 13-27.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Plaintiff's Arguments

Plaintiff makes the following arguments:

1. The ALJ erred in evaluating the credibility of plaintiff's statements about her pain.

2. The ALJ failed to account for plaintiff's headaches and need to elevate her legs in the RFC assessment.

## Legal Standards

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

1

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.[2]

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work

---

[2] The legal standards for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) are largely the same. The above paragraph in this order cites the relevant statutory provisions for DIB, while the SSI provisions are located at 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D), and 20 C.F.R. § 416.972. Most citations herein are to the DIB regulations out of convenience, but also apply to SSI challenges.

experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

**The Decision of the ALJ**

ALJ Martin followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that she was insured for DIB through December 31, 2017. He found that plaintiff had severe impairments of degenerative disc disease, status post lumbar fusion surgery in 2003; osteoarthritis and degenerative medial meniscal tearing in both knees; obesity; pain disorder; anxiety; depression; and personality disorder.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with some physical and mental limitations. The mental limitations are

3

not at issue here.  The physical limitations are that she was limited to standing and/or walking for a total of two hours a day; occasional climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolding; and occasional balancing, stooping, kneeling, crouching and crawling.  Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do her past work, but she was not disabled because she was able to do other jobs which exist in significant numbers in the national and regional economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the plaintiff's arguments.

**1.      Agency Forms**

Plaintiff was born in 1971 and was 40 years old on the alleged date of onset.  (Tr. 195.) She said she was unable to work because of a number of problems, including a back injury, carpal tunnel syndrome, a neck injury, headaches, and knee pain.  She was 5'2" and weighed 225 pounds.  She had stopped working on March 27, 2012.  She had a high school education and had worked as an assistant manager in retail sales, a billing clerk, a customer service representative, and a factory worker.  (Tr. 198-200.)

In June 2013, plaintiff reported that she had pain since having back surgery in 2003.  She could sit or stand for only 30 minutes at a time.  She had migraine headaches and knee pain.  She spent much of her time laying down with ice on her back for 20 minutes and 20 minutes off.  She watched television.  Her partner did all the household chores, but she did prepare simple meals such as frozen meals in the microwave.  She left home only once a week.  She shopped for ten minutes a week for food and "take out orders."  (Tr. 226-233.)  In February 2014, she reported

4

that she mostly stayed in bed because of back pain. Her knee hurt more and she was unable to walk any distance. Her headaches were worse. (Tr. 239.)

      2.      **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in May 2016. (Tr. 34.)

Plaintiff testified that her last job was in customer service at Nutrition Headquarters. She worked there for almost eight years. She was sitting down at a computer for most of the day. She left that job because she could not sit all day. She used all of her vacation and sick time and her FMLA benefits. (Tr. 39-40.)

Plaintiff said she had chronic back pain that travelled down her legs. She had that since she had back surgery in 2003. It had gotten worse over time. She had neck pain. Her knees were swollen and the menisci were torn in both knees. (Tr. 42.)

Plaintiff began seeing a neurosurgeon for back pain in 2013. Around the time she stopped working, she was just seeing her family doctor and a chiropractor. The ALJ asked her why she did not see a specialist or pain management before she quit working. She said that the pain management doctor she had been seeing moved away. (Tr. 43-44.) At the time of the hearing, she was seeing a pain management doctor and a chiropractor. The pain management doctor prescribed Hydrocodone. The chiropractor did electrical stimulation and ultrasound on her knees. He also adjusted her neck. Her family doctor prescribed Flexeril and Naproxen. The treatment helped her "cope with the pain." (Tr. 49.)

Plaintiff had neck pain and headaches since a car accident in 1986. She had a migraine headache two to three times a week. Her headaches sometimes lasted for two hours. (Tr. 47-48.)

Plaintiff had pain and swelling in her knees since 2013. She had injections, but they did not help. (Tr. 49.) She had swelling in her knees every day. (Tr. 67.) She also had numbness

5

and tingling in her hands from carpal tunnel since 2011. (Tr. 55.) However, she had a nerve conduction study which did not show carpal tunnel syndrome. (Tr. 64.)

Plaintiff did not do much during the day. She iced her back and knees and lay down using a STIM unit. She cooked food in the microwave sometimes. Her boyfriend did the housework and yardwork. She no longer did the grocery shopping. She did not use a computer and had no hobbies. The doctor who treated her knees told her to ride an exercise bicycle, but that caused pain in her low back, so he aid to just keep her legs elevated and ice her knees and take Naproxen. The last trip that she took was to a NASCAR race in 2000. (Tr. 51-55.)

Plaintiff entered into a civil union with her boyfriend in November 2012 so that she could get on his health insurance. (Tr. 60-61.)

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but she could do other jobs such as repack room worker, wire cutter, and assembler. (Tr. 71-75.)

### 3. Medical Records

Plaintiff underwent spinal fusion surgery in August 2003. (Tr. 365.)

In September 2011, Plaintiff saw a pain management specialist, Dr. Yogesh Malla, for upper back pain and low back pain radiating into her right leg. She indicated that she had good relief following her back surgery until about 2009. A CT scan from June 2011 showed evidence of the prior discectomy and fusion with osteophyte formation, along with degenerative disc disease/spondylosis at the upper three levels. She had an upcoming consultation with a neurosurgeon. Dr. Malla prescribed a nonsteroidal anti-inflammatory drug, Flexeril, and Lortab. She was to return in November following her visit with the neurosurgeon. (Tr. 279-291.) There

6

is no record of a visit with a neurosurgeon at that time or a follow-up visit with Dr. Malla.

The alleged date of onset is March 27, 2012.

Plaintiff received primary health care at Logan Primary Care Services. She was seen there for upper respiratory infections and sinusitis in January, October and December 2012. There were no notations of complaints of back, neck or knee problems or of headaches. (Tr. 531-541.)

The only other record from 2012 is from chiropractor Douglas Cochran. Plaintiff saw Dr. Cochran eleven times from February through December for low back pain radiating into her right leg. (Tr. 514-524). She returned in August 2013, reporting that she had been using "home remedies" including stretching, medicine, ice and heat, and had "managed to get by." However, her pain had gone from her usual "3-4" to "7-8." (Tr. 513.)

Plaintiff was seen by the chiropractor sporadically from August 2013 through May 2016. She had 11 visits in 2014, 18 visits in 2015, and 3 visits in 2016. She was seen several times in some months, and was not seen at all in other months. For instance, she was not seen at all from July through September 2015, and from December 2015 through March 2016. (Tr. 455-513.) The treatment records consist of a printed form that was filled out on each visit; the forms contain little information.

Plaintiff returned to Logan Primary Care Services in December 2013 to follow up on her back pain and anxiety. There are no records from this provider since December 2012. She said she had been given a referral to a pain management doctor in Cape Girardeau, Missouri, in November, but had not heard anything from that office. On exam, she had a full range of motion of the spine and extremities, and gait and station were normal. She was prescribed Motrin and Flexeril, and told to follow-up with pain management. (Tr. 327-328.) She was seen again for back pain in February 2014. (Tr. 320-322.) She presented with headaches in December 2014.

7

She said this had been going on for a long time, and Excedrin and sometimes a muscle relaxer helped. She was prescribed Imitrex as needed for headache and was to have an MRI of the brain. (Tr. 405-407.) The next visit was in June 2015, for medicine refills. She had no specific complaint except that Flexeril was not helping much anymore. Physical exam was normal. She was prescribed Robaxin instead of Flexeril. (Tr. 402-403.) The last visit with Logan Primary Care was in February 2016. Plaintiff was seen for medicine refills for chronic back pain. She was "doing well on medications." Physical exam was normal. (Tr. 393-395.)

Plaintiff began seeing Dr. Bernard Burns, a pain management specialist, in December 2013. She saw him a total of 10 times through January 2016. (Tr. 338-347, 352-364.) On the first visit, he noted her history of decompression fusion surgery with pedicle screws and rods, and that she had seen a pain management doctor and a chiropractor on and off since then. She reported that her pain was worse with standing and with prolonged sitting. She had pain and numbness and burning across the low lumbar area and down the right leg. On exam, she was very guarded in her motion and had "very minimal lumbar range of motion." Imaging studies showed "extensive lateral boney fusion mass." Dr. Burns diagnosed diffuse degenerative disc disease with diffuse degenerative joint disease and hypertrophic facets at multiple levels throughout the lumbar spine and an intermittent radicular pain pattern with quite a bit of variability. He recommended a physical therapy program along with home exercises, and prescribed a short supply of hydrocodone. (Tr. 340-341.)

In April 2014, Dr. Burns noted that plaintiff had been ill with a sinus infection and a severe reaction to diverticulitis which had required hospitalization. She had been able to attend a few physical therapy sessions. On exam, he found diffuse tenderness through the low back and "some other myofascial tenderness which suggests a more generalized syndrome." He ordered an MRI.

8

The MRI showed moderate to severe neural foraminal narrowing at L5-S1 due to bone proliferative changes, which had likely progressed since the prior study. (Tr. 344-347.) In July 2014, Dr. Burns noted that she had gallbladder surgery since the last visit. She was not up to formal therapy. (Tr. 363-364.) Dr. Burns continued to refill her hydrocodone. (Tr. 361.)

In January 2015, plaintiff's pain was at "mid range, 5-6/10." She was able to do her exercises a little bit better. Dr. Burns sent her for a drug screen as she was still being prescribed hydrocodone. His office sent her a letter on January 13, 2015, stating that her drug screen did not demonstrate any of the drugs that he had been prescribing; she was, therefore, terminated as a patient. However, it was determined that this was an error and she continued to be treated by Dr. Burns. (Tr. 356-360.)

In July 2015, Dr. Burns noted that plaintiff was doing her home exercise program, but was having difficulty getting to it lately. She said that the use of medications helped her to be able to do the exercises and to remain more independent with activities at home. She was "[m]ore independent with instrumental activities of daily living" and "completely independent with activities of daily living." (Tr. 354.)

In January 2016, Dr. Burns suggested that she may have a "fibromyalgia component." Eight of nine tender points were positive in a right-sided survey. Her medication sensitivity and features of irritable bowel syndrome "suggest the fibromyalgia syndrome may be actually present for a longer period of time." She was to continue on hydrocodone. (Tr. 352.)

Plaintiff's knee pain was treated by Dr. John Davis. She saw him once in September 2013 and returned in August 2015. She saw him five more times through February 2016. He diagnosed osteoarthritis and meniscal tears of both knees. (Tr. 371-391.) In November 2015, she requested a corticosteroid injection as she was having trouble walking and she wanted to attend

her son's track meet in Arkansas. He injected her right knee and instructed her to continue to use ice, elevate, and take anti-inflammatories as needed. (Tr. 381-382.) In January 2016, after MRI studies of both knees, Dr. Davis advised against arthroscopic surgery. He recommended a series of three hyaluronic acid ("Supartz") injections in both knees. The first two were done in January and February 2016; she was to return for the third in six months. (Tr. 371-376.)

## Analysis

Plaintiff first argues that the ALJ improperly concluded that that her statements about the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.

The ALJ cited to SSR 16-3p, which supersedes the previous SSR on assessing a claimant's credibility. SSR 16-3p was republished in October 2017 and can be found at 2017 WL 5180304. SSR 16-3p became effective on March 28, 2016, and should be applied by the ALJ in any case decided on or after that date. 2017 WL 5180304, at *1. SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." *Ibid.*, at *2. "Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Ibid.*, at *11. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. In addition, the ALJ is required to explain the rationale for his conclusion: "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be

consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Ibid*., at \*10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. *See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the ALJ made the usual boilerplate statement that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons

11

explained in this decision." (Tr. 24.) This statement is nonsensical: if plaintiff's impairments could reasonably be expected to cause the symptoms that she alleges, why does the ALJ doubt the accuracy of her claims? See, *Goins v. Colvin,* 764 F.3d 677, 681–82 (7th Cir. 2014), making the point regarding a very similar boilerplate statement.

The ALJ failed to give specific reasons supported by the evidence for doubting the veracity of plaintiff's claims. He pointed out that plaintiff had worked for years after her fusion surgery and that there was "no correlation in the medical records with the alleged onset date." (Tr. 25.) This observation ignores the nature of plaintiff's back problem. She had fusion surgery with the placement of hardware, which remains in place. She returned to work, but her back pain returned. Dr. Burns diagnosed her with degenerative disc disease and degenerative joint disease. The term "degenerative" implies "a condition that will get worse over time." *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013.) In fact, the ALJ himself recognized that plaintiff's "osteoarthritis and degenerative disc disease worsened over time." (Tr. 25.) Therefore, the fact that plaintiff was able to work for several years after her back surgery does not imply that her claims about her symptoms were exaggerated. Nor does the lack of medical treatment at the time of the alleged onset of disability. Plaintiff is not claiming that a traumatic event caused her to stop working. Rather, a gradual increase in her pain made it too difficult to continue. Further, she testified that she lost her medical insurance when she quit working, and was uninsured until she entered into a civil partnership in late 2012. The ALJ erred in failing to consider her lack of insurance. *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013.)

The ALJ also noted plaintiff's "benign activities of daily living, including travelling to her son's track meet." (Tr. 25.) He said that plaintiff prepared simple meals, went outside twice a week, drove a car, shopped in stores on a weekly basis, and paid her own bills. (Tr. 16.) This is

12

a reference to a function report submitted by plaintiff in June 2013. Plaintiff actually said that her meal preparation consisted of putting frozen meals in the microwave, that her civil partner did all of the house work and yard work, that she went outside once a week, and that she shopped once a week for ten minutes. (Tr. 228-229.) These meager activities hardly suggest an ability to work fulltime. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013.)

As for travelling to her son's track meet, there is no evidence that plaintiff actually did so. She told Dr. Davis that she wanted to attend the meet, at which her son was trying to qualify for the Olympic team, and asked him to give her a shot in her knee to help her walk, but there is no indication in the record that she actually travelled to Arkansas. If she did go, there is no evidence about what the trip entailed. The ALJ asked her no questions about that subject.

Lastly, the ALJ pointed out that her treatment "was limited to medication." (Tr. 25.) First, this is incorrect in that she also received chiropractic treatment for her back and neck and injections for her knees. If the ALJ meant to suggest that plaintiff's condition could not be disabling because it was treated only with medication, that is a medical conclusion that the ALJ was not competent to draw. *Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015.)

In addition, the ALJ was selective in his review of the record, to plaintiff's disadvantage. For instance, he remarked that the pain management doctor dropped her "due to lack of truthfulness" after her drug screen. (Tr. 22.) He neglected to mention that Dr. Burns determined that she had been terminated in error, and he continued to treat her. The ALJ also suggested that plaintiff elected not to have arthroscopy on her knees (Tr. 24), but Dr. Davis' notes clearly state that he did not recommend arthroscopy.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ

explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). The assessment of plaintiff's RFC will require "a fresh look" after reconsideration of her credibility. *Ibid.*

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Helen L. D.'s application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: JUNE 12, 2018**

>*s/ J. Phil Gilbert*
>**J. PHIL GILBERT**
>**DISTRICT JUDGE**